IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MITORIA R. & CORTEZ T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MITORIA R. AND CORTEZ T., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

VICTORIA R., APPELLANT.

Filed June 21, 2016.    A-15-1049.

Appeal from the County Court for Madison County: ROSS A. STOFFER, Judge. Affirmed.

Matthew A. Headley, Madison County Public Defender, and Megan E. Osler for appellant.

Gail E. Collins, Deputy Madison County Attorney, for appellee.

Jason Lammli, guardian ad litem for appellant.

Martin V. Klein, guardian ad litem for children.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Victoria R. appeals from the decision of the county court for Madison County, sitting as a juvenile court, terminating her parental rights to her children, Mitoria R. and Cortez T. We affirm.

BACKGROUND

Victoria is the biological mother of Mitoria, born in June 2012, and Cortez, born in May 2007. The children's fathers were not a part of their lives, are not part of this appeal, and will not be discussed any further. Mitoria and Cortez were removed from Victoria's care on October 1, 2013, after the Nebraska Department of Health and Human Services (DHHS) investigated reports

- 1 -

of Cortez' excessive absences from school (more than 10 days by the end of September), and a "J" shaped injury to his abdomen which a doctor opined was non-accidental.

On October 1, 2013, the State filed a petition alleging that Mitoria and Cortez were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) due to the faults or habits of Victoria in that: Cortez had an non-accidental injury on his stomach for which Victoria refused to cooperate with law enforcement and provide an explanation; and due to the above allegation the children were at risk for harm. On that same date, the State also filed for, and was granted, immediate custody of Mitoria and Cortez; they have been in an out-of-home placement ever since. On October 13, a guardian ad litem (GAL) was appointed for the children.

On January 10, 2014, the State filed an amended petition alleging that Mitoria and Cortez were children as defined by § 43-247(3)(a) and set forth the same grounds as noted above, but also included an allegation that Cortez had an excessive number of school absences.

On January 13, 2014, after a contested hearing, the juvenile court adjudicated Mitoria and Cortez to be within the meaning of § 43-247(3)(a). The court ordered the children to remain in the custody of DHHS.

The court held a disposition hearing on March 25, 2014. In its order filed that same day, the court adopted the provisions of the DHHS case plan dated March 12 and ordered all parties to comply with the terms of the case plan. The DHHS case plan recommended a permanency plan of reunification with an alternative plan of adoption. Among the plan's provisions were: that Victoria comply with the recommendations of her psychological evaluation including, but not limited to, individual and family therapy, "parenting skills," evaluation for medication management, and support groups; and that Victoria have supervised visits with two supervising persons in attendance. The specific goals and strategies set forth in the case plan will be addressed later in our opinion via the testimony of Vickie Christiansen.

Review hearings were held in June, October, and December 2014. The court continued to adopt the provisions of the DHHS case plans, which remained unchanged since March. Additionally, in its June order, the court ordered Victoria to attend and cooperate in counseling, and attend and cooperate at visits.

On March 2, 2015, the State filed a supplemental "petition" to terminate Victoria's parental rights to Mitoria and Cortez pursuant to Neb. Rev. Stat. § 43-292(5), (6), and (7) (Cum. Supp. 2014). The State alleged that: Victoria was unable to discharge parental responsibilities because of mental illness or mental deficiency and there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; the children had been in out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

On March 3, 2015, the children's GAL filed a motion to suspend Victoria's visitation. The GAL alleged: Victoria had not complied with the case plan/court reports as ordered by the court; Victoria had not complied with the requests of DHHS and family support workers; Victoria had not complied with requests from counselors; and an attached letter from Cortez' therapist stated that it would be in the children's best interests to suspend visits with Victoria.

On March 5, 2015, a GAL was appointed for Victoria. On March 6, Victoria filed a motion for change of placement, and asked the court to place Mitoria and Cortez with her.

A hearing on the motion to suspend visitation was held on April 28, 2015. In its order filed on May 7, the juvenile court sustained the motion and suspended visitation between Victoria and the children "until such time as this matter is resolved at the Termination Hearing or until such time as Victoria demonstrates that visitation between her and the minor children is in the children's best interest[s]."

The termination hearing began on August 6, 2015, and continued on August 7 and 14. Testimony was given and evidence was received as to why Victoria's parental rights should be terminated. Victoria did not testify.

Traci Fox, a children and family services specialist with DHHS, testified as follows. In September 2013, DHHS received a report concerning educational neglect, because even though the school year had just begun, Cortez had already missed a significant number of school days. Fox was assigned to investigate the report. When Fox went to the family's home, Victoria did not answer the door for several minutes, and when she did open the door she was uncooperative. Later in September, DHHS received a second report concerning possible physical abuse of Cortez. Fox again went to the family's home, and when Victoria finally answered the door she was agitated, and was hollering and screaming; law enforcement had to step in between Victoria and Fox. After Fox, law enforcement, and one of Victoria's relatives tried to calm her down, Victoria walked away and refused to converse any further. Fox and law enforcement obtained an ex parte order to remove the children. When they went to remove the children on October 1, Victoria refused to open the door or engage in conversation. After a search warrant was obtained, law enforcement forcibly entered the home and removed the children. Because of her actions during the removal process, Victoria was arrested; the record reflects that Victoria subsequently pleaded guilty to obstructing a police officer, a Class I misdemeanor, and was sentenced to 6 months' probation.

Based on her interactions with Victoria, Fox was concerned that Victoria had mental health and intellectual functioning issues that would impact her ability to parent. Fox testified that Victoria would often give responses that were not relevant to the question being asked, would not cooperate with workers, and continued to believe that the children would be returned to her "at the next hearing." After she referred Victoria for a psychological evaluation, Fox was no longer involved in the case.

Vickie Christiansen, a child a family services specialist with DHHS, testified as follows. She was assigned to this case on October 18, 2013, taking over for Fox. After the children were adjudicated in January 2014, Christiansen authored a court report/case plan on March 12, 2014, prior to the disposition hearing; the goals and strategies set forth in that case plan remained the same throughout this case. The March court report and case plan was received into evidence as exhibit 54.

Christiansen testified that the March 2014 court report and case plan set forth two goals for Victoria. Goal number one was that Victoria would "provide a safe and stable environment for Cortez and [Mitoria] free of physical discipline where there [sic] physical and emotional needs are being met." Six strategies were listed for achieving that goal. The first strategy was that Victoria would work with providers on appropriate, non-physical discipline. Christiansen testified Victoria

had not made any progress on this strategy, as she had not been amenable to working with support workers, Dr. Snitchler (Cortez' therapist), or Dr. Hannappel (Victoria's therapist); she said that Victoria did not believe she had a problem as it related to discipline.

The second strategy was that Victoria would work with providers on developing and utilizing coping skills for when she felt anxious or upset. Christiansen testified that family support services, individual therapy, and supervised visits had been offered to Victoria to help her develop these skills but Victoria felt she did not need help.

The third strategy was that Victoria would work with providers on engaging with her children in nurturing activities and interacting with them both together and individually. Again, Christiansen stated that family support workers and individual therapists had given Victoria suggestions, but she had not followed through; Victoria rarely engaged Cortez, and when she did it was inappropriate, like when she asked him whether he had been sexually molested.

The fourth strategy was that Victoria would involve her children in activities outside of the home to help promote improved social skills and interaction in public. Christiansen testified they never got to this strategy because visits never really progressed beyond one hour.

The fifth strategy was that Victoria would work to improve her relationship with the school, including working with providers to understand the children's needs. Christiansen testified that Victoria initially refused to give consent for Cortez to be tested for special education services, and only signed the consent after being threatened with a court order.

The sixth strategy was that Victoria would work with providers to be able to identify her children's developmental milestones. According to Christiansen, Victoria had made limited progress in this area, as she would not let Mitoria off of the couch to explore and play, and was not in favor of any testing when there were concerns about Mitoria's speech development.

Christiansen testified that goal number two was that Victoria would "be able to express her feelings, emotions, concerns and wants without becoming emotionally upset as evidenced by not becoming physically aggressive, yelling, crying uncontrollably and becoming defiant." Five strategies were listed for achieving this goal. The first strategy was that Victoria would comply with the recommendations of the psychological evaluation, which included individual and family therapy, "parenting skills," evaluation for medication management, and support groups. Victoria completed the psychological evaluation, but refused to do a psychiatric evaluation for medication because she insisted that she was fine and did not need medication. Victoria also insisted that her parenting skills were fine and that she did not need any help in that regard.

The second strategy was that Victoria would work with providers on being able to identify coping skills that she could use when she felt herself becoming emotionally upset; this was to include identifying triggers that caused her to become upset, identifying situations that she could remove herself from, and learning how to take feedback and constructive suggestions from others who were working with her and her children. Christiansen testified that Victoria had done "very poorly" on this and had "been very rude," had "sworn at family support workers when they've been trying to help her," had "a lot of emotional outbursts in front of the children," and had "sucked her thumb herself walking around the visitation room." Victoria was "not open to suggestions from family support workers."

The third strategy was that Victoria would become more involved in outside activities. Christiansen said they never really got to this strategy, other than Victoria reported going on walks to the library and the post office.

The fourth strategy was that Victoria would develop a support system to improve her social skills and interactions with others and which she could use when she was feeling stressed or when she needed assistance getting her children to school. Again, Christiansen said that they never got to this strategy because anytime Victoria was asked about her friends and family she refused to give any information and told Christiansen it was none of her business.

The fifth strategy was that Victoria would work with providers on identifying past traumas in her life that still affected her and affected her parenting and relationships with her children. Christiansen testified that based on her conversations with Victoria and with Dr. Hannappel, Victoria made "very limited, if no progress at all" on this strategy.

Christiansen testified that she read all of the family support worker notes and also had numerous conversations with the family support workers. When the case began in October 2013, Victoria had two one-hour visits per week. On November 26, visits were reduced to one one-hour therapeutic visit each week, with two supervising persons (Dr. Snitchler and a family support worker) present at each visit due to safety concerns. Six months later, in the early summer of 2014, Dr. Snitchler was no longer part of the therapeutically supervised visits; visits continued to be once each week, supervised by two family support workers, until visitation was suspended in May 2015. (Although Christiansen testified that visits continued to be one one-hour visit each week, other testimony and evidence reveals that visits were briefly increased to one two-hour visit each week at the end of 2014 and into early 2015.)

Christiansen testified that she personally observed some of the visits between Victoria and her children. During a visit in November 2013, she observed Victoria: thoroughly examine Mitoria's anal and vaginal areas during a diaper change and excessively wipe in those areas; have little to no interaction with Cortez; and not be receptive to the support workers, yelling and swearing at them. During a visit in January 2014, she observed Mitoria seek out support workers when she needed assistance rather than Victoria, and noticed that Cortez was "meek" around Victoria, who yelled at him during the visit. During a February visit, Victoria would not let Mitoria off of the couch and made her sit beside her during the entire visit. During a November visit, Victoria read a book out loud, but was not reading it to either child as they were off playing on their own; Victoria was not receptive to suggestions on how to get the children to engage with her. After the November visit, Cortez asked Christiansen if he still had to have visits with Victoria and said he only felt comfortable and safe when there were two support workers in the room. Christiansen was called into a February 2015 visit because Victoria felt that one of the support workers was harassing her by asking what she brought with her in her backpack (the worker just wanted to know if Victoria had brought activities or food for the children). After Christiansen left, she was called back to the visit a second time because Victoria was upset and thought that the support worker injured Mitoria's arm (the worker had assisted Mitoria in getting out from under a table) and told the worker she would file charges; Victoria was "very emotional, very out of control, would not settle down, yelling[,] [j]ust really out of control."

Christiansen also testified about problems at visits in general, and her testimony was supported by the family support workers' visitation notes received into evidence as exhibit 70. She said there were problems with Victoria taking things from the children, Cortez in particular, which caused a lot of stress and unhappiness for the child; for example, she took bracelets from Cortez that he had been given for good behavior and kept them for herself. There were safety concerns including Victoria's explosive behaviors and the amounts and kinds of food she brought for the children. Victoria was also unwilling to work with family support workers to engage in appropriate conversations and interactions with her children. Throughout the case there was a continuing problem with Victoria examining the children and talking to them about sexual contact; despite discussions with Victoria, no improvement was made.

The visitation notes, exhibit 70, reveal the following. Victoria often gave her children hugs and kisses. She brought the children food every visit, but sometimes she allowed them to eat too much (to the point of sickness) or gave Mitoria food that was a choking hazard. Victoria would play with the children at the beginning of a visit, but would quickly turn her attention to Mitoria and leave Cortez to entertain himself; if Cortez tried to engage Victoria, she often ignored him. When Cortez' behaviors needed redirection, Victoria would yell at him or ignore him; her discipline was inconsistent and there was no follow-through. Victoria often discussed inappropriate topics with Cortez; for example, she would talk about serial killers and adult movies and characters like "Chucky" (a killer doll), Freddy Krueger, and "The Exorcist." Victoria repeatedly questioned Cortez about whether anyone was sexually abusing him or his sister. She often had emotional outbursts and would yell and curse at the children and the visitation supervisors.

Christiansen testified that throughout this case, Victoria repeatedly accused numerous persons (Christiansen, family support workers, therapists, and the foster parents) of either having a sexual interest in her children or sexually abusing her children. When someone gave Cortez something for a headache or when Mitoria needed nebulizer treatments, Victoria feared everyone was trying to overmedicate her children; the record reveals that at one point she said, "On no. They're going to kill them." Christiansen tried to talk to Victoria about specific things she needed to work on to get her children back and what services would be helpful, but Victoria would not engage in the conversation; Victoria said nobody was going to tell her what to do and "everything was just fine and she just needed to get her children back."

Numerous services were provided to Victoria. Christiansen testified that Victoria was provided: supervised visitation; family support services to help her gain parenting skills; family team meetings (Victoria only "minimally" participated); taxi cab vouchers to various appointments and court dates; a psychological evaluation; and individual therapy. And Victoria would have been provided a psychiatric evaluation had she been willing to participate. Despite these services, Victoria made little to no progress. In Christiansen's opinion, Victoria is not able to provide her children with care and protection or a safe and stable living environment. Christiansen does not believe that Victoria can provide for the children's emotional needs, nor does she believe that Victoria has established a positive bond with the children. Christiansen testified that it would be in the children's best interests to terminate Victoria's parental rights.

The children's foster father testified as follows. He is the assistant principal at a junior high school and his wife is a secretary at the elementary school Cortez attends. Mitoria and Cortez have been placed with them since April 2014. Prior to placement, the foster parents first met Victoria who asked them if they were serial killers and pedophiles; even after the foster parents explained that they were neither and that they had gone through background checks, Victoria still questioned them.

The foster father testified that when the children first came to their home, there was concern that both children were behind. Mitoria, who was almost 2 years old at the time, did not seem to be speaking at the level she should be or interacting and responding to stimuli as expected. Cortez, who was almost 7 years old at the time, struggled with behaviors, emotional control, and being redirected, as well as in his interactions with other children and adults. Cortez was delayed in his learning and they questioned whether he needed to be held back a year in school; the foster parents, teachers, and administrators felt that the delayed learning was the result of missing too much school, and they all wanted to wait awhile before pursuing special education testing. As of August 2015, Cortez was doing "much better"; he interacted well with others and no longer had "fits of rage." Mitoria was also doing well; she was able to run and jump, and she talked "constantly," was asking questions, and was very observant.

The foster father testified regarding the children's behavior changes when they had visits with Victoria. The days he was scheduled to have a visit, Cortez woke up and did not want to go, saying he had a stomachache or a headache. When the children came home from visits they were "bouncing off the walls," would not eat meals (because they had lots of snacks and fast food during visits), and were more aggressive in their behavior; also, Cortez would laugh when the foster parents tried to redirect him. The foster mother's testimony was in agreement with her husband's testimony.

Both Christiansen and the foster father testified that Cortez had therapy immediately following visits with Victoria. According to Christiansen, it was so that Cortez could have a "safe place" to discuss how the visit went.

Dr. Eric Snitchler, a clinical psychologist, began working with Cortez in October 2013; therapy had been weekly until a few weeks before the termination hearing when it switched to every other week. Other than during the summer of 2014, Cortez' therapy appointments would immediately follow his visits with Victoria.

Dr. Snitchler testified as follows. When Cortez first began therapy, he was unable to regulate his emotions or behavior, could not sit still or focus for very long, sucked his thumb continuously, had no ability to make friends, was behind academically, had poor boundary issues, and was anxious and depressed. Cortez was diagnosed with attention deficit hyperactivity disorder and prescribed medication. While it took some time, Cortez made significant progress and was doing "remarkably better." And Cortez was "definitely calmer" during therapy sessions after visits were suspended in May 2015. Dr. Snitchler testified that during therapy, Cortez never spoke about missing Victoria or wanting more time with her; in fact, Cortez said he did not want to live with Victoria.

In addition to having therapy appointments with Cortez, Dr. Snitchler, along with a family support worker, attended weekly supervised therapeutic visits involving Cortez, Mitoria, and

Victoria from November 2013 to June 2014; he supervised one additional visit in December 2014. He also reviewed all visitation worker notes from June 2014 to May 2015, when visits were suspended. Dr. Snitchler testified that if Cortez was misbehaving during visits, Victoria would either yell at him or ignore the behavior, but there was rarely consistency or follow-through. Victoria "infrequently" made an effort to play with or engage Cortez; most of Victoria's attention was towards Mitoria. Victoria spent significant amounts of time each visit combing Mitoria's hair, changing her diapers, or wiping her nose; Mitoria was usually crying because Victoria was rough with her actions. Victoria did not appear to show appreciation for the children's emotional needs. Dr. Snitchler testified that the biggest safety issue he observed was Victoria providing food to Mitoria that was a choking hazard--he specifically referenced "gummies" that were difficult for Mitoria to chew; Mitoria would often choke on the object, cough it up, and then Victoria would still give her more despite warnings from visitation supervisors. During visits, Victoria examined Cortez for injuries and would question any marks she found. And during almost every visit, Victoria asked Cortez if anybody had touched him or his sister sexually. Victoria also accused Dr. Snitchler of having a sexual interest in her children.

Another DHHS worker testified that she observed one visit between Victoria and her children in March 2014. During the visit, Victoria was "mumbling and talking to herself, reaching in the air for things that only she could see, would start -- burst out laughing or start talking just kind of randomly to herself." Also during that visit, Victoria had Mitoria on her lap and ignored Cortez for a majority of the hour; at the end of the hour Victoria discussed appropriate touching with Cortez and asked him if he had been molested.

Dr. Snitchler testified that if Cortez was placed back with Victoria, "I'd expect the consequence would be significant. The prognosis would drop, his progress that he's made would go down"; he believed that Cortez' social, emotional, and academic functioning would all be negatively impacted. Cortez did not show much of a bond with Victoria. And Dr. Snitchler said that based on his observations and what was written in the family support worker notes, it did not appear that Mitoria had an emotional attachment to Victoria; he said that Mitoria "does not seek her mom for emotional comfort, attention, and often resists contact." He testified that children need security, safety, and stability.

Dr. Hannappel, a psychologist, performed a psychological evaluation of Victoria in October 2013, and shortly thereafter began having weekly therapy sessions with her; he was still treating her at the time of the termination hearing. In the 2013 psychological evaluation, which was received into evidence, Dr. Hannappel stated that Victoria's performance on the intellectual assessment was not considered a valid indicator of her abilities because she did not put forth good effort on all aspects of the testing and was "quite uncooperative at times"; however, he stated that "[i]t does appear likely that she has fairly limited intellectual abilities." Victoria's report and intellectual assessment indicated "Mild Mental Handicapped Intellectual Abilities and limited academic abilities." Dr. Hannappel's evaluation also noted that Victoria "appears to have serious psychiatric problems" that he could not specifically identify because she was not forthcoming about her psychiatric history or current mental status. He noted that "Victoria tends to have a low level of empathy for her children and will likely find it hard to nurture Cortez and [Mitoria], especially Cortez, in a manner that will allow for healthy development for the long term." Further,

"Victoria's responses suggested that she will use Cortez and [Mitoria] to meet her needs as opposed to her meeting [their] needs." In his evaluation, Dr. Hannappel opined that Victoria had limited potential to improve her ability to become an adequate parent.

At the termination hearing, Dr. Hannappel testified as follows. Victoria had been diagnosed with mood disorder, not otherwise specified; personality disorder, not otherwise specified; and a provisional diagnosis of mild mental handicap. There was also a "rule out" diagnosis for bipolar disorder. Dr. Hannappel worked with Victoria to "increase her insight into her psychiatric/psychological issues, as well as her intellectual abilities, how they impact her adult functioning as well as how they might impact her ability to adequately parent the children." During therapy sessions, Victoria said visits with the children were going well and that she was doing fine, but her impressions were inconsistent with the visitation notes provided to Dr. Hannappel; when confronted with the inconsistencies, Victoria's response was that the family support workers were lying.

The notes he received from the family support workers caused Dr. Hannappel a number of concerns. The primary concern was Victoria's "over focus" and worry that the children were being sexually abused in some way by the family support workers and the foster care parents; Victoria would ask Cortez about it and would check Mitoria's private parts. (In an April 2015 letter authored to Christiansen, which was received into evidence as exhibit 72, Dr. Hannappel noted that Victoria had accused him of making a sexual pass at her and also accused him of asking to touch Mitoria in a sexualized manner.) Another concern was that the family support notes suggested there was a lack of a bond between Victoria and the children, which was inconsistent with Victoria's report to Dr. Hannappel that she had a good bond with her children.

Dr. Hannappel testified that at a team meeting in December 2014, he recommended that visits be extended because Victoria had not been given enough opportunity to demonstrate whether she would be capable of adequately caring for her children. Based on his recommendation, visits were increased from one to two hours each week. However, after reviewing the visitation notes, his impression was that Victoria did not do any better at the two-hour visits, and "some things actually deteriorated with the extended period of time."

When asked what kind of progress Victoria made on her counseling therapy sessions, Dr. Hannappel responded "minimal to none." In terms of parenting, he said that Victoria had not really made any type of progress, "and that's primarily related to her lack of insight or lack of willingness to acknowledge limitations." He further testified that it was his opinion that Victoria did not have the capability of being an adequate parent because of her psychiatric and personality problems, and that her "mental illness will persist into the foreseeable future."

In its order filed on October 27, 2015, the juvenile court terminated Victoria's parental rights to Mitoria and Cortez pursuant to § 43-292(5), (6) and (7), and found that termination was in the children's best interests.

Victoria has timely appealed the termination of her parental rights.

ASSIGNMENTS OF ERROR

Victoria assigns, consolidated and restated, that the juvenile court erred in: (1) finding grounds exist to terminate her parental rights under § 43-292(2), (5), (6), and (7); (2) finding it was

in the children's best interests to terminate her parental rights; and (3) denying her "Motion for Change of Placement" and "Objection to Letter Update/Case Plan."

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Victoria's parental rights to Mitoria and Cortez, the juvenile court found that grounds for termination existed under § 43-292(5), (6), and (7).

Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Mitoria and Cortez were removed from Victoria in October 2013. At the time the supplemental "petition" to terminate parental rights was filed in March 2015, the children had been in an out-of-home placement for 17 months. At the time of the termination hearing in August 2015, the children had been in an out-of-home placement for 22 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Victoria's parental rights under § 43-292(7) were proven by sufficient evidence.

We note that Victoria asserts the court erred in finding grounds exist to terminate her parental rights under § 43-292(2) (substantial and continuous or repeated neglect and refusal to give the juvenile, or a sibling, necessary care and protection). However, that ground was neither alleged by the State in its supplemental "petition," nor used by the court as a basis for termination. Accordingly, we need not consider whether termination of Victoria's parental rights was proper under § 43-292(2).

Furthermore, we need not consider whether termination of Victoria's parental rights to Mitoria and Cortez was proper under § 43-292(5) and (6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S., supra.* Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re*

*Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Victoria consistently attended visitation and therapy. The visitation notes showed that she would often give the children hugs and kisses during visits. She was also concerned about her children's safety, sometimes to the extreme. While there were some positives during the visits, there were more negatives. Victoria would bring food for the children, but there were concerns about the amounts and kinds of food she brought for the children. There were also concerns about Victoria's explosive behaviors, where she would yell at the visitation workers. Victoria was also unwilling to work with family support workers to engage in appropriate conversations and interactions with her children. Throughout the case there was a continuing problem with Victoria examining the children and talking to them about sexual contact; she repeatedly accused numerous persons (Christiansen, family support workers, Dr. Snitchler, Dr. Hannappel, and the foster parents) of either having a sexual interest in her children or sexually abusing her children.

Discussions were had with Victoria about specific things she needed to work on to get her children back and what services would be helpful, but Victoria would not engage in the conversation; Victoria said nobody was going to tell her what to do and "everything was just fine and she just needed to get her children back." When Victoria's version of events differed from that of the visitation workers', she accused the workers of lying. Her visits were limited to one or two hours per week and remained fully supervised by two persons until such time as visits were suspended in May 2015.

Dr. Hannappel's evaluation noted that Victoria "appears to have serious psychiatric problems" that he could not specifically identify because she was not forthcoming about her psychiatric history or current mental status. He noted that "Victoria tends to have a low level of empathy for her children and will likely find it hard to nurture Cortez and [Mitoria], especially Cortez, in a manner that will allow for healthy development for the long term." Further, "Victoria's responses suggested that she will use Cortez and [Mitoria] to meet her needs as opposed to her meeting [their] needs." In his evaluation, Dr. Hannappel opined that Victoria had limited potential to improve her ability to become an adequate parent. When asked what kind of progress Victoria made on her counseling therapy sessions, Dr. Hannappel responded "minimal to none." In terms

of parenting, he said that Victoria had not really made any type of progress, "and that's primarily related to her lack of insight or lack of willingness to acknowledge limitations." He further testified that it was his opinion that Victoria did not have the capability of being an adequate parent because of her psychiatric and personality problems, and that her "mental illness will persist into the foreseeable future." See *In re Interest of D.A.B. and J.B.*, 240 Neb. 653, 483 N.W.2d 550 (1992) (finding that although the mother was provided with extensive services to assist her in properly raising her children, she was unable to profit from the instruction provided because of her mental deficiency).

Dr. Snitchler testified that if Cortez was placed back with Victoria, "I'd expect the consequence would be significant. The prognosis would drop, his progress that he's made would go down"; he believed that Cortez' social, emotional, and academic functioning would all be negatively impacted. In Dr. Snitchler's opinion, Cortez did not show much of a bond with Victoria. Cortez never spoke about missing Victoria or wanting more time with her; in fact, Cortez said he did not want to live with Victoria.

Numerous services were provided to Victoria including supervised visitation, family support services, family team meetings, a psychological evaluation, and individual therapy. Despite these services, Victoria made little to no progress. Christiansen testified that Victoria made little to no progress on the case plan, is not able to provide her children with care and protection or a safe and stable living environment, cannot provide for the children's emotional needs, and does not have a positive bond with the children. Accordingly, Christiansen testified that it would be in the children's best interests to terminate Victoria's parental rights. We agree. "[W]hen a natural parent suffers from a mental deficiency and cannot be rehabilitated within a reasonable period of time, the best interests of the child require that a final disposition be made without delay." *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 141, 602 N.W.2d 439, 448 (1999). See, also, *In re Interest of D.A.B. and J.B., supra* (stating same). We find that the State has rebutted the presumption of parental fitness. We further find that it is in Mitoria and Cortez' best interests that Victoria's parental rights be terminated.

*Remaining Assignment.*

Victoria asserts that the juvenile court erred when denying her "Motion for Change of Placement" and "Objection to Letter Update/Case Plan." We need not address this assignment of error because we are affirming the termination of Victoria's parental rights and such matters would have no bearing on that decision. See *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Victoria's parental rights to Mitoria and Cortez.

AFFIRMED.